**This order is SIGNED.**

**Dated: March 7, 2017**



KEVIN R. ANDERSON
U.S. Bankruptcy Judge

*slo*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re: | Bankruptcy Number: 15-27071 |
| KEVIN ROBERT  GRIFFITH, | Chapter 7 |
| Debtor. | |
| ROBERT MCKELL, | Adversary Proceeding No. 15-02188 |
| Plaintiff, | |
| vs. | Hon. Kevin R. Anderson |
| KEVIN ROBERT GRIFFITH, | |
| Defendant. | |

FINDINGS OF FACT AND CONCLUSIONS OF LAW

The matter before the Court is the Plaintiff's Complaint for determination of dischargeability of a debt under 11 U.S.C. § 523(a)(2)(A)-(B). A trial was held on January 18, 2017 at 9:00 a.m. The Plaintiff, Robert McKell, and his counsel, Joshua Lee, appeared. Likewise, the Defendant, Kevin Griffith, appeared with his counsel, Steven Rogers and Nicholas Russell.

After considering the evidence, including facts as stipulated to or admitted by the parties, as adduced from testimony, or as established by the introduction of exhibits, and after assessing the credibility of the witnesses, considering the arguments of counsel, and conducting an independent review of the law, the Court is prepared to rule and now issues its findings of fact and conclusions of law. Any of the findings of fact herein are deemed, to the extent appropriate, to be conclusions of law, and any of the conclusions of law herein are similarly deemed to be findings of fact, and they shall be equally binding as both.

I.    INTRODUCTION

In this case, the Debtor learned of a potentially lucrative business investment but needed immediate cash before the window of opportunity closed. The Debtor approached a social and business acquaintance (the "Creditor") to lend him $25,000 with the promise of a $50,000 repayment within 30 days. To "secure" the loan, the Debtor gave the Creditor a warranty deed on residential property. The Debtor represented there was sufficient equity in the property to fully satisfy the loan, when in fact a trust deed fully encumbered the property. The investment failed, no payments were made on the loan, but the Creditor never recorded the warranty deed. Five years later, with the Debtor now in bankruptcy, the Creditor asks this Court to declare the debt nondischargeable based on the Debtor's misrepresentation of equity in the property. The Debtor counters that he did not know the trust deed had been recorded, and that his former employer had agreed to pay off the note associated with the trust deed; thus, at the time of the loan, the Debtor had a genuine and reasonable belief that there was sufficient equity in the property to satisfy the obligation. For the reasons set forth below, the Court finds that the debt is dischargeable.

II.    JURISDICTION, NOTICE, AND VENUE

The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. § 1334(a)-(b) and 28 U.S.C. § 157(b). The Plaintiff's request for a determination as to the dischargeability of a particular debt is a core proceeding under 28 U.S.C. § 157(b)(2)(I), and the Court may enter a final order. Venue is appropriate in this District under 28 U.S.C. §§ 1408 and 1409, and notice of this hearing was properly given to all parties in interest.

III.    FINDINGS OF FACT

1)    The Loan

Shortly before October 11, 2011, Debtor/Defendant Kevin Robert Griffith (the "Debtor") approached a social and business acquaintance, Robert McKell ("McKell"), with a short-term, overseas investment opportunity involving the production of identification cards for African immigrants seeking entry into European countries (the "ID Card Venture").[1]  The Debtor asked McKell to lend him $25,000 to cover production costs but stated they must act quickly or the opportunity would be lost. Based on the profit potential of the ID Card Venture, the Debtor offered McKell a 200% return within one month.[2] McKell ultimately agreed to loan the money, and on October 11, 2011, the parties met at McKell's bank to negotiate and complete the loan (the "Loan").[3] At the bank, McKell and the Debtor reviewed four documents: (1) a promissory

_____

[1] The Debtor testified that he made his proposal to McKell within 24 to 48 hours before they executed the loan documents on October 11, 2011.

[2] The Debtor stated that he expected to make a "large profit" from this investment opportunity.

[3] McKell testified that he funded the Loan with $25,000 withdrawn from his personal account at Zions Bank.

note; (2) a warranty deed; (3) a handwritten document; and (4) a property tax report.[4] The Debtor's representations in these documents are at the core of this proceeding.

### a) The Promissory Note & Warranty Deed

The promissory note provided that McKell would loan the Debtor $25,000,[5] and in return, the Debtor would repay McKell $50,000 by November 10, 2011 (the "McKell Note").[6] To secure the loan, the McKell Note required the Debtor to "pledge, assign, and/or grant" to McKell the residential real property located at 4361 Vrain Street, Denver, Colorado 80212 (the "Vrain St. Property" or the "Property").[7] The McKell Note contains the following representation: "Maker [the Debtor] warranties that this property is owned by Maker and is free and clear of all encumbrances."[8] The McKell Note provided that in the event of default, "[McKell] shall have the remedy of filing the Warranty Deed that has the same date as this document, and taking full ownership of the property listed herein as Collateral."[9] Consistent therewith, the Debtor signed and delivered to McKell a warranty deed to the Vrain St. Property (the "Warranty Deed").[10]

---

[4] During the trial, both McKell and the Debtor disputed who prepared the promissory note and warranty deed. Plaintiff's Exh. 1 and 2. Indeed, they both stated that the other brought these documents to the bank. However, there is no dispute that the Debtor prepared the handwritten document while at the bank. *See* Plaintiff's Exh. 3. McKell testified that the details of the loan were not discussed until they arrived at the bank.

[5] Plaintiff's Exh. 1.

[6] *Id.* The Debtor testified that he could have obtained more favorable loan terms from a "standard lender." However, due to the short timeframe of the investment opportunity, he had to act quickly and that is why he contacted McKell, who he knew from prior social and business interactions.

[7] *Id.*

[8] *Id.* .

[9] *Id.*

[10] Plaintiff's Exh. 2. The Debtor testified that at the time of the Loan he did not understand the difference between a warranty deed and a trust deed.

b)  The Handwritten Document & the Tax Assessment

Also at the bank, the Debtor wrote out and signed a declaration regarding equity in the Property (the "Equity Declaration").[11] The Equity Declaration states: "Equity in home referenced in this transaction belongs to Kevin R. Griffith and fully secures this loan dated 11 October 2011 between the 'Parties', Kevin R. Griffith and Robert C. McKell."[12] The Debtor testified that he intended the phrase "fully secures" to mean that he owned sufficient equity in the Property to secure the McKell Note. McKell testified that he thought the Debtor prepared the Equity Declaration to overcome McKell's reluctance to loan the money.

While at the bank, McKell also had the Debtor review and initial a print-out from the Denver County Assessor's Office regarding the Vrain St. Property (the "Tax Assessment").[13] The Tax Assessment shows that it was printed on October 10, 2011, at 2:59 p.m., which is the day before the Loan. The Tax Assessment values the Property at $288,200 and lists the names of "GRIFFITH, KEVIN R & SUSAN."[14] Susan Griffith is the Debtor's ex-spouse. The Debtor testified that McKell asked him to prepare the Equity Declaration because the Tax Assessment listed Susan Griffith as a co-owner of the Property.

After completing their negotiations and reviewing and signing the documents, McKell delivered to the Debtor the sum of $25,000.

---

[11] *See* Plaintiff's Exh. 3. The Debtor testified that it is his handwriting on the Equity Declaration.

[12] *Id.*

[13] *See* Defendant's Exh. B. While the Court is not relying on this exhibit for purposes of establishing the actual value of the Vrain St. Property, it is relevant as to what information McKell knew about the Vrain St. Property through his own investigation.

[14] *Id.* The address listed for the Property on the Tax Assessment matched the Mckell Note and Warranty Deed. *Compare* Plaintiff's Exh. 1 and 2.

2) The Debtor Defaults on the McKell Note

The ID Card Venture did not pan out, and the Debtor did not repay the McKell Note on November 10, 2011.[15] At trial, McKell and the Debtor gave different accounts as to what happened thereafter.

a) McKell's Testimony

McKell testified that after the default, he tried to contact the Debtor by phone, but was unsuccessful. McKell also contacted other individuals he thought might know of the Debtor's whereabouts, but again, these efforts were unsuccessful. Sometime later (McKell could not provide even a general date), McKell hired an attorney to collect the debt. Approximately a year later on October 26, 2012, McKell's attorney sent a letter to the Debtor demanding payment of $53,666.66 under the McKell Note.[16] The letter also stated: "If you do not pay by [November 15, 2012], we may exercise our rights under the law, including foreclosure on any secured property which is security for the loan along with the filing of a legal action to collect on the Note."[17] Finally, the letter stated that McKell "may proceed on the basis of fraud based on your misrepresentation as to the status of the title to the property."[18] Though McKell could have recorded the Warranty Deed at any time after the default, he testified he "did not see any rush to record it" and that his attorney was primarily focused on collecting on the McKell Note. McKell could not recall whether he ever directed anyone to record the Warranty Deed.[19]

_____

[15] Plaintiff's Exh. 1.

[16] Plaintiff's Exh. 4.

[17] *Id.*

[18] *Id.*

[19] McKell testified that he had never attempted to "foreclose" on the Property, but later stated that "someone" went out to Colorado to foreclose. However, he was unclear what happened with this effort.

6

b) <u>The Debtor's Testimony</u>

In contrast to McKell's testimony, the Debtor stated that after November 10, 2011, he saw McKell on a "regular basis" at the office. In fact, he and McKell were still working on other investments during that time in an effort to repay McKell. While the ID Card Venture was unsuccessful, the Debtor believed other investments would yield returns to repay McKell.[20] Unfortunately these investments likewise did not result in payments to McKell. However, the Debtor stated that during this time, McKell did not demand repayment.[21]

A year later in October 2012, and at approximately the same time as McKell's demand letter, the Debtor left for Hong Kong to focus on other investments that he hoped would provide for repayment to McKell. The Debtor believed that pursuing investment opportunities in Asia would be the fastest way to repay McKell.[22] Nevertheless, after spending four years out of the country in pursuit of these investments, the Debtor still did not repay McKell.[23] The Debtor stated that he did not consider selling the Vrain St. Property to repay McKell because he was in Asia for four years working on investments and "didn't have the thought process." Also, the Debtor knew that because McKell held the Warranty Deed, he could at any time record it and take ownership of the Property.

---

[20] The Debtor testified that the nature of the investments involved the purchase and sale of financial instruments in Asia and Europe, including bank guarantees and medium-term notes.

[21] The Debtor testified that McKell never personally demanded repayment of the Loan through any of their conversations or communications.

[22] The Debtor stated that traveling to Asia was necessary to pursue investment transactions because another business associate had done "some fraudulent, illegal things" that resulted in "devastating financial circumstances" for him.

[23] The Debtor explained the risks involved with these investment transactions. He stated that "you could do a lot of work and the transaction might not complete." Additionally, he testified that he had put his own money, "hundreds and thousands," into separate investments and had not been repaid.

3)  The MTM Ltd. Trust Deed

At the core of McKell's complaint is the allegation that the Debtor's representation of equity was materially false because the Property was subject to a previously-recorded trust deed for $630,000. In response, the Debtor asserts he was aware of the trust deed but did not know it had been recorded. On its face, it tests the limits of credibility for a party to assert they were not aware of a trust deed signed by them – especially one for over half a million dollars. However, the Debtor's explanation, while complex and not fully joined, is plausible.

At some point after the Debtor's default (McKell could not recall a date), McKell's attorney informed him that the Property was subject to a $630,000 trust deed signed by the Debtor and recorded on August 21, 2008, in favor of MTM, Ltd. (the "Trust Deed").[24] Based on the recorded Trust Deed, McKell argues that there was no equity in the Property at the time of the Loan. Because there was no dispute as on this issue, the Court will find that as of October 11, 2011, the date of the Loan, there was no equity in the Property.

The events involving the execution and recording of the Trust Deed begin in 2007. Between 2007 and October 2008, the Debtor was a 25% owner of Solution X, and for a time he served as its Chief Executive Officer. On November 26, 2007, Solution X and its principals, including the Debtor, signed a promissory note for $630,000 in favor of MTM Ltd. in repayment of a $1,025,000 investment in Solution X (the "Morley Note").[25] MTM Ltd. is owned by Mike Morley ("Morley"), who was a close friend and business associate of the Debtor. To secure the

---

[24] Plaintiff's Exh 6.

[25] Plaintiff's Exh. 8. Other parties were also included in the terms of this promissory note, but the Debtor, Solution X, and MTM LTD are the focus of this document.

8

Morley Note, the Debtor agreed to pledge two of his personal properties – a residence in Utah County, Utah[26] and the Vrain St. Property.[27]

The Debtor testified that he pledged his properties to help his friend Morley obtain new financing for his construction business. At the time of the Morley Note, the Debtor understood that Morley was experiencing financial difficulties, partially caused by the delay of Solution X in repaying Morley's investment. Morley wanted to use the Debtor's properties to improve his balance sheet to obtain new financing for MTM Ltd. The Debtor also testified that based on his conversations with Morley, it was never the parties' intent that the Debtor would personally repay the Morley Note. Indeed, Morley never made a demand on the Debtor to repay the Morley Note and Morley never threatened or initiated foreclosure proceedings under the Trust Deed.

a) <u>May - July 2008—the Debtor Signs a Trust Deed in Favor of Morley</u>

On May 12, 2008, Morley emailed the Debtor saying, "I could send you the deed so I could get started on the loan if there is a [sic] address or I could just email it and you could sign it and send it back if you have time." [28] The Debtor testified that this email meant that Morley was asking for a trust deed on the Vrain St. Property to facilitate a loan for MTM Ltd. Morley followed up on his request in emails dated May 16, May 22, and June 7, 2008.[29] On June 27, 2008, Morley prepared the Trust Deed.[30] A month later on July 27, 2008, the Debtor signed the Trust Deed.[31] At trial, the Debtor stated he never received any consideration for giving Morley the Trust Deed because that was not part of the arrangement. On August 21, 2008, Morley

---

[26] Plaintiff's Exh. 8 at ¶ 4. *See also* Schedule D in Case No. 15-20381 (Dkt. No. 5).

[27] *Id.* at ¶ 4.

[28] Plaintiff's Exh. 9.

[29] Plaintiff's Exhs. 10-12.

[30] Plaintiff's Exh. 6.

[31] *Id.* at p. 5 of 6.

recorded the Trust Deed.[32] There is no evidence that a copy of the recorded Trust Deed was sent

to the Debtor, and the Debtor testified that Morley did not inform him that the Trust Deed had

been recorded. The Debtor also testified that he first learned that the Trust Deed had been

recorded when McKell produced it in connection with the prior adversary proceeding filed in

March 2015 (Adv. Pro. No. 15-02056).

b)  <u>The October 2008 Agreement Between the Debtor and Solution X</u>

On October 2, 2008, the Debtor signed an agreement severing his relationship and

employment with Solution X (the "Severance Agreement").[33] At trial, Section (2) of the

Severance Agreement was discussed extensively. It provides:

> [Solution X International] agrees to accept full responsibility for the Mike Morley
> Note, which was revised on or about September 19, 2008, and [Solution X
> International] further agrees to allow Morley, at Morley's discretion, to release
> GRIFFITH'S personal guarantee on the original Note, and further to release
> GRIFFITH'S houses as collateral and deed them back to GRIFFITH, despite the
> language in the revised Note to the contrary.

The Debtor testified that the "Mike Morley Note" referenced in this section was the

Morley Note, and that Solution X and Morley had replaced the Morley Note with a new note on

September 19, 2008 (the "Solution X Note").[34] However, the Debtor was not a party to the

Solution X Note and has not seen it. The Debtor also testified that this section meant that

Solution X would take full responsibility for the Morley Note.[35] Additionally, the Debtor

understood Section (2) to mean that the Trust Deed was "released" at the signing of the

---

[32] *Id.*

[33] Defendant's Exh. A. The full parties to the agreement included the Debtor, Solution X, and Solution X
International.

[34] Neither party produced a copy of the September 19, 2008 Note at the trial. Nevertheless, the Debtor testified that
he understood from Morley and Mr. Shields, Solution X's legal representative, that the Solution X Note
"superseded" the earlier Morley Note.

[35] The Debtor testified that before October 2008, he understood, after discussions with Morley, that Solution X was
making payments to Morley on the Morley Note.

Severance Agreement even though the Severance Agreement gave Morley "discretion" to release the Debtor's personal guarantee and the Debtor's "houses as collateral." The Debtor said this understanding was based on conversations with Morley and Scott Shields, Solution X's in-house counsel, shortly after the Severance Agreement was signed.[36] At the time of the Severance Agreement, the Debtor testified that he understood that Morley had not recorded the Trust Deed.

c)  Events After the Severance Agreement

After the Severance Agreement in October 2008, the Debtor understood, through conversations with Morley, that Morley was receiving "sizable" payments from Solution X under the Solution X Note.[37] Sometime in 2009, the Debtor learned from Morley that Solution X had stopped making payments on the Morley Note.[38] But the Debtor understood that shortly thereafter Morley and Solution X had reached a settlement or agreement, and that the problem was resolved. Between the time of the Severance Agreement and the McKell Note, the Debtor testified that Morley never mentioned in any of their communications that the Debtor needed to repay him, and Morley never mentioned that he had recorded the Trust Deed.

In summary, the Debtor testified to the following regarding the Morley Note and the Trust Deed: (1) the parties never intended that the Debtor would make payments on the Morley Note or that Morley would ever foreclose on the Trust Deed; (2) that at all relevant times, the Debtor was in regular communication with Morley; (3) between July 2008 and October 2011, Morley never indicated that he had recorded the Trust Deed; (4) the Debtor believed that

---

[36] The Debtor also stated that Morley communicated to him in their conversations that the Trust Deed would not be recorded.

[37] However, the Debtor testified he was unaware of the specific amounts of the payments and the actual payment schedule.

[38] The Debtor stated he learned this from an email, and that during this time Solution X had also stopped making payments to him under the Severance Agreement.

Solution X had assumed all liability under the Morley Note and that Morley would release his claim to the Debtor's properties as collateral for the Morley Note; (5) at the time of the McKell Note, the Debtor did not know that Morley had recorded the Trust Deed; (6) the Debtor was not aware of any action to foreclose the Trust Deed; and (7) the first time the Debtor learned that the Trust Deed had been recorded was when McKell filed an adversary proceeding in his prior chapter 13 bankruptcy case and provided a copy to the Debtor.[39]

### 4) The Ex-Spouse's Interest in the Property

McKell further alleges that the Debtor represented that he was the sole owner of the Property when in fact he co-owned it with his ex-spouse Susan Griffith. The Debtor and Susan Griffith, acquired the Property in 1984 for $70,000.[40] The Debtor and Susan Griffith divorced in 1990. At that time, the divorce decree did not make a division as to ownership in the Property, but later it was modified to give the Debtor sole control over the Property including decisions as to improving it, renting it, or selling it.[41] The modified divorce decree also allowed the Debtor to first recover his costs associated with the managing the Property, including mortgage payments and improvements, before any equity would be divided between him and Susan Griffith.

The Debtor testified that after the divorce, he contributed between $170,000 and $200,000 towards the Property. These contributions included paying off the initial mortgage of $70,000, making $100,000 in improvements, paying property taxes, and repairing damages caused by renters. Based on his contributions to the Property, the Debtor testified that at the time

---

[39] See Case No. 15-20381 filed January 19, 2015, and Adv. Pro. No. 15-02046 filed March 11, 2015, asserting claims for non-dischargeability under 11 U.S.C. § 523(a)(2)(A)-(B). Ultimately, the parties stipulated to the dismissal of this adversary proceeding without prejudice (Dkt. No. 11). Shortly thereafter on June 2, 2015, the court dismissed the Debtor's chapter 13 case.

[40] Plaintiff's Exh. 5. Deed between Earnest R. Beall and Gayle L. Beall conveying the Property to the Debtor and Susan Griffith on June 25, 1984.

[41] Neither party produced a copy of the divorce decree at trial.

12

of the Loan, he believed any equity Susan Griffith had in the Property had been effectively

"wiped out" under the terms of the modified divorce decree. Nonetheless, the Debtor testified

that he was uncertain as to the exact nature of Susan Griffith's interest in the Property because he

was unaware of any court order regarding the same. The Court will thus conclude that Susan

Griffith is presently a co-owner of the Property, but for purposes of this matter only, that she has

no claim to any equity in the Property.

## IV.   CONCLUSIONS OF LAW & ANALYSIS

As a preliminary matter, the Court notes that it had the opportunity to evaluate the

testimony of the Debtor and McKell. The Court finds the testimony of the Debtor to be generally

and relatively more credible than McKell's testimony, which was often evasive, sometimes coy,

and frequently unresponsive to questions.

1)   <u>The Applicable Legal Standard – § 523(a)(2)(A) or § 523(a)(2)(B)</u>

The Court must first determine which subsection of § 523(a) controls – § 523(a)(2)(A) or

(a)(2)(B). Section 523(a)(2)(B) applies if the Debtor's written representations regarding equity in

the Property related to his "financial condition." Otherwise, § 523(a)(2)(A) applies with its

causes of action for false pretenses, false representations, or actual fraud. This determination has

various consequences, but most relevant to this case is that a statement in writing respecting a

debtor's financial condition requires "reasonable" reliance, while, under controlling case law, §

523(a)(2)(A) only requires "justifiable" reliance.[42]

The Tenth Circuit has held that a writing respecting a debtor's financial condition is

limited to "[s]tatements that present a picture of . . . the debtor or insider's net worth, overall

---

[42] *Field v. Mans*, 516 U.S. 59, 73-75 (1995).

financial health, or equation of assets and liabilities."[43] Based on the evidence and testimony presented at trial, the written representations about the Property in the McKell Note, the Warranty Deed, and the Equity Declaration were not statements regarding the Debtor's overall financial health or net worth. Moreover, even McKell admitted that the Debtor's representations only concerned the Property as a "discrete" asset and were not related to his "overall financial health."[44] Because there is no evidence that the Debtor made statements regarding his overall financial condition, the Court finds that § 523(a)(2)(B) does not apply and will limit its analysis to § 523(a)(2)(A).

2)   <u>False Representations - § 523(a)(2)(A).</u>

Section 523(a)(2)(A) states in relevant part: "(a) [a] discharge under section 727 . . . does not discharge an individual debtor from any debt . . . (2) for money . . . to the extent obtained by—(A) false pretenses, a false representation, or actual fraud . . . ."[45] Plaintiffs in § 523 actions carry a heavy burden because exceptions to discharge are to be narrowly construed, and any doubt as to a debtor's culpability and intent is to be resolved in the debtor's favor.[46]

To except a debt from discharge for false representation, a "creditor must prove the following elements: (1) [t]he debtor made a false representation; (2) the debtor made the representation with the intent to deceive the creditor; (3) the creditor relied on the representation; (4) the creditor's reliance was justifiable; and (5) the debtor's representation caused the creditor

---

[43] *Cadwell v. Joelson (In re Joelson)*, 427 F.3d 700, 714 (10th Cir. 2005).

[44] Plaintiff's Trial Brief at 4, McKell v. Griffith, Adv. No. 15-02188 (Bankr. D. Utah Jan. 5, 2017), Dkt. No. 18.

[45] 11 U.S.C. § 523(a)(2)(A).

[46] *See DSC Nat'l Props., LLC v. Johnson* (*In re Johnson*), 477 B.R. 156, 168 (B.A.P. 10th Cir. 2012) (citation omitted).

14

to sustain a loss."[47]

  a)  <u>Representations in the McKell Note</u>

The Debtor made two representations in the McKell Note. First, "Maker [the Debtor] warranties that this property is owned by Maker."[48] This statement is correct as the Debtor was (and is) the owner of the Property. McKell stated that he interpreted this representation to mean that the Debtor was the sole owner of the Property. The Court notes that the specific language of the McKell Note does not make such a representation. More compelling, however, is that one of the parties brought the Tax Assessment to the bank and McKell had the Debtor initial it.[49] that listed the Property owners as "GRIFFITH, KEVIN R & SUSAN."[50] Further, the Debtor testified that McKell asked him to prepare the Equity Declaration because the Tax Assessment listed Susan Griffith as a co-owner of the Property. Based on this, the Court finds that the Debtor's statement that he was the owner of the Property was not a misrepresentation.

The second representation in the McKell Note is that the Property was "free and clear of encumbrances."[51] This representation was factually incorrect because the Property was subject to the $630,000 Trust Deed that was recorded three years before the McKell Note.[52]

---

[47] *Id.* at 169.

[48] Plaintiff's Exh. 1.

[49] The parties contradicted each other as to who brought the Tax Assessment to the bank. The Court believes McKell obtained the Tax Assessment the day before the Loan because he had the Debtor initial, and McKell produced it as evidence. Nonetheless, the relevant point is that McKell saw the Tax Assessment at the time of the Loan and it had sufficient significance to him that he had the Debtor initial it. The Court must therefore conclude that he saw its disclosure as to the owners of the Property.

[50] Defendant's Exh. B. The address listed for the Property on the Property Information Statement matched the Note and Warranty Deed. *Compare* Plaintiff's Exh. 1 and 2.

[51] Plaintiff's Exh. 1.

[52] *Compare* Plaintiff's Exhs. 1 and 6.

b)  Representations in the Equity Declaration

The Debtor also made two representations in the Equity Declaration. First that the "[e]quity in the home referenced in this transaction belongs to Kevin R. Griffith."[53] This statement was true because Susan Griffith's equity interest in the Property had been effectively eliminated through the Debtor's ongoing payment for expenses and improvements on the Property ($170,000 to $200,000). Further, because the Debtor was an owner of the property, any equity therein would inherently "belong" to him.

The second representation was that the equity in the Property "fully secures this loan dated 11 October 2011 between the 'Parties', Kevin R. Griffith and Robert C. McKell."[54] This representation was factually incorrect because the Property was subject to the $630,000 Trust Deed that consumed any equity therein. Thus, both the Equity Declaration and the McKell Note contain the misrepresentation that there was sufficient equity in the Property to fully secure the McKell Note.

c)  Justifiable Reliance

As indicated above, since McKell's cause of action arises under § 523(a)(2)(A), the Court must find that he relied on these misrepresentations and that such reliance is "justifiable." Justifiable reliance is an intermediate, subjective standard positioned between "reasonable" reliance and "mere" reliance.[55] Justifiable reliance means that "[a] person is 'required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or

---

[53] Plaintiff's Exh. 3.
[54] *Id.*
[55] *Field v. Mans*, 516 U.S. 59, 72-73 (1995).

16

investigation.'"[56] For purposes of § 523(a)(2)(A) actions, a creditor's reliance is unjustified "only where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own."[57]

Testimony was elicited from both parties as to McKell's "knowledge and intelligence." The Court finds that McKell has greater business knowledge and experience than he represented at trial, such that he and the Debtor were generally on equal footing as to their negotiating positions and business acumen.[58] Nonetheless, the Court finds, based on the following, that McKell's reliance was justifiable.

It is undisputed that McKell required the Warranty Deed to make him whole if the Loan was not repaid. While there was conflicting testimony on the issue, the Court finds that McKell prepared the McKell Note and the Warranty Deed and brought them to the bank at the time of the Loan. The Debtor signed these documents and provided McKell with the Equity Declaration for purposes of assuring McKell that he would have recourse against the Property in the event of

---

[56] *Id.* at 71 (quoting the Restatement (Second) of Torts (1976) § 541, cmt. a (1976)).

[57] *Id.* (citation omitted).

[58] For instance, when first asked about his profession, McKell stated he was a heavy equipment operator and was not in the business of lending money. However, McKell later admitted that he had a prior interest in at least two businesses, McKell Construction and McKell and Associates. But when asked about the latter entity, McKell stated that he could not remember details regarding the business's sole asset, a helicopter, including when the helicopter was sold, for how much, and whether it had been financed. When asked whether he was a board member or director for any businesses, McKell said he was not authorized to say. Later, McKell stated he was not. McKell also testified that he had been involved in about six, but less than ten, real estate transactions involving residential properties and lots while participating in McKell Construction. McKell also testified that he made six personal loans or "buddy-loans" to non-relatives for over $25,000 each. However, McKell could only remember some details about one of the loans. McKell was also unsure whether any of these "buddy-loans" were secured by any property or if he was ever repaid anything. Additionally, the Debtor testified as to what he knew of McKell's prior business dealings. From their conversations, the Debtor understood that McKell had transacted "dozens" of real estate deals. For example, McKell had been involved with the management and liquidation of storage unit properties in Springville or Spanish Fork, Utah. Finally, the Debtor also stated that McKell had previously worked with him on other investment opportunities or transactions and travelled with the Debtor's business associates to Hong Kong to explore investment opportunities there.

Default. There is nothing in the Loan documents that "from a cursory glance" would have put McKell on notice as to the existence of the Trust Deed. Thus, applying the applicable legal standard to the facts of the case, the Court finds that even though McKell did not conduct a title search or otherwise check for encumbrances on the Property, he was justified in relying on the Debtor's representations that the Property had sufficient equity to fully cover the $50,000 repayment of the Loan.

However, it is a closer call as to McKell's belief that the Debtor's ex-spouse, Susan Griffith, did not have an interest in the Property. The Court finds that McKell saw the Tax Assessment the day before or on the day of the Loan and was therefore aware, at least according to the county records, that the Property was titled in the name of the Debtor and Susan Griffith. Thus, the Court finds that McKell was not justified in his reliance to the extent he asserts he did not know that Susan Griffith was a co-owner of the Property.

    d)  <u>Intent to Deceive</u>

Having found a misrepresentation and justifiable reliance, the dispositive issue is whether at the time of the Loan the Debtor acted with the requisite scienter to deceive McKell as to the equity in the Property and/or his intent to repay the Loan. The Tenth Circuit has limited the harsh result of nondischargeability to "frauds involving moral turpitude or intentional wrong."[59] The debtor must have acted with the subjective intent to deceive the creditor.[60] While a debtor's "reckless disregard for the truth" may be evidence of an intent to deceive, granting relief under §

---

[59] *Driggs v. Black* (*In re Black*), 787 F.2d 503, 505 (10th Cir. 1986) (*abrogated on other grounds by Grogan v. Garner*, 498 U.S. 279 (1991)); *Chevy Chase Bank FSB v. Kukuk* (*In re Kukuk*), 225 B.R. 778, 787 (B.A.P. 10th Cir. 1998); *N. N.M. Orthopaedic Ctr., P.C. v. Auge* (*In re Auge*), 2015 Bankr. LEXIS 1398 (Bankr. D. N.M. Apr. 22, 2015).

[60] *First Nat'l Bank v. Cribbs* (*In re Cribbs*), 327 B.R. 668, 674 (B.A.P. 10th Cir. 2005), *aff'd, First Nat'l Bank v. Cribbs* (*In re Cribbs*), No. 05–6225, 2006 WL 1875366 (10th Cir. July 7, 2006). *See also Kukuk*, 225 B.R. at 786-88.

523(a)(2)(A) based on such evidence should only be made "in very narrow circumstances."[61]

When analyzing a debtor's subjective intent to deceive, the court may draw inferences "from the totality of the circumstances."[62] "Making a representation to a creditor with a 'reckless disregard for the truth' may be some evidence of an intent to deceive the creditor."[63] "However, a finding of 'reckless disregard for the truth' translates into subjective intent to deceive (i.e., scienter) only in very narrow circumstances."[64] In addition, "[c]arelessness in making a statement that turns out to be untrue constitutes negligence, and a negligent misrepresentation is not necessarily fraudulent."[65] Further, a court can examine a "debtor's conduct at the time of the representations" and "subsequent conduct" to determine the debtor's intent or state of mind.[66] Finally, the Court finds the following factors from Section 526 of the Restatement (Second) of Torts to be relevant and helpful.

> A misrepresentation is fraudulent if the maker --
> (a) knows or believes that the matter is not as he represents it to be,
> (b) does not have the confidence in the accuracy of his representation that he states or implies, or
> (c) knows that he does not have the basis for his representation that he states or implies.[67]

---

[61] *DSC Nat'l Props., LLC v. Johnson (In re Johnson)*, 477 B.R. 156, 169 (B.A.P. 10th Cir. 2012) (citation omitted).

[62] *Id.* (citing *In re Cribbs*, 327 B.R. at 673).

[63] *Id.*

[64] *Id.* (citing *In re Kukuk*, 225 B.R. at 787).

[65] *Id.* at 170.

[66] *Groetken v. Davis* (*In re Davis*), 246 B.R. 646, 652 (B.A.P. 10th Cir. 2000) ("A debtor does not make a false representation under § 523(a)(2)(A) merely by presenting a check for payment which later bounces. Rather, the creditor must show that the debtor was guilty of misrepresentation with intent to defraud in direct connection with issuance of the check. A false representation can be established if the debtor did not intend to pay the creditor when the check was issued and knew that the check would bounce.") (citations omitted), *aff'd in part*, *vacated*, *and remanded in part on other grounds*, 35 Fed. App'x. 826 (10th Cir. 2002).

[67] *In re Johnson*, 477 B.R. at 170 (quoting the Restatement (Second) of Torts § 526 (1976)).

Applying the evidence to the applicable legal standards, the Court finds that the Debtor did not intend to deceive McKell. The Debtor testified that his representations regarding equity in the Property, made in the McKell Note, the Warranty Deed, and the Equity Declaration, were honest and accurate based on his knowledge at the time he made such representations.

Specifically, the Debtor testified that while he had signed the Morley Note and the Trust Deed, he was not aware that Morley had recorded the Trust Deed against the Property. Indeed, there was no evidence that the recorded Trust Deed had been provided to the Debtor prior to McKell's filing of an adversary proceeding in March 2015. The Debtor's belief that the Trust Deed had not been recorded was founded upon his multiple conversations with Morley, who never demanded payment of the Morley Note, never mentioned recording the Trust Deed, and never initiated foreclosure proceedings even though the Morley Note came due on March 31, 2008.

The Debtor further supported the reasonableness of this belief by producing the Severance Agreement, which provided that Solutions X would assume and satisfy the Morley Note. The Debtor also testified that the Morley Note was never intended to be his personal obligation because Morley was his long-time, close friend. Further, Morley asked the Debtor for the Trust Deed because Solution X was slow in making payments to Morley, and Morley needed it to assist in procuring financing relating to other projects. In other words, the transaction between the Debtor and Morley was one of friendship and accommodation rather than an arms-length, debtor/creditor relationship. Thus, the Debtor testified that the parties never intended that that Morley would seek repay of the Morley Note from the Debtor directly or that Morley would foreclose on the Trust Deed.

20

Besides this, the Debtor's subsequent conduct shows he did not intend to deceive McKell. Upon the failure of the ID Card Venture, the Debtor continued working on other investments with the intent to repay McKell. Though the Debtor and McKell gave different accounts of the events after default, the Court finds the Debtor's version to be credible. The Court agrees that McKell seemed exclusively interested in a cash repayment rather than exercising his remedy to take title to the Property by recording the Warranty Deed.

While not all of the Debtor's declarations regarding his belief that the Trust Deed was unrecorded are equally compelling, any doubt as to a debtor's culpability and intent is to be resolved in the debtor's favor, and the Court will do so in this instance.[68]

3)   <u>False Pretenses – § 523(a)(2)(A)</u>

Unlike false representations which are express misrepresentations, false pretenses involve a series of events that, when considered collectively, create a contrived and misleading understanding of a transaction that wrongfully induced a creditor to extend money to the debtor.[69]

An examination of the Debtor's conduct evidences that the Debtor did not obtain the Loan under false pretenses, and that he did not wrongfully induce McKell to loan him money. At the time of the Loan, the Debtor believed there was sufficient equity in the Property to fully secure the $50,000 McKell Note. Although factually incorrect, this belief was reasonably based on the Debtor's prior communications and dealings with Morley and Solution X. The veracity of the Debtor's intent at the time of the Loan is also supported by his subsequent conduct. The Court finds the Debtor's testimony to be credible that he worked to repay McKell. Although

---

[68] *Id.* at 168.
[69] *Cordell v. Sturgeon (In re Sturgeon)*, 496 B.R. 215, 223 (B.A.P. 10th Cir. 2013) (citation omitted).

traveling to Asia to pursue investment opportunities complicated his communications with McKell, that was the nature of the Debtor's business and the Court will not make any negative inferences from this fact. Based on the "totality of the circumstances" and the evidence before the Court, the Court finds that the Debtor did not obtain the money through false pretenses.

4) Actual Fraud – § 523(a)(2)(A)

To except a debt from discharge "based on actual fraud, the creditor must show: (a) the debtor committed actual fraud; (b) the debtor obtained money, property, services, or credit by the actual fraud; and (c) the debt arises from the actual fraud."[70] Put simply, actual fraud is "anything that counts as 'fraud' and is done with wrongful intent."[71] No misrepresentations, however, are necessary.[72] Actual fraud can be manifested "when a debtor intentionally engages in a scheme to deprive or cheat another of property or a legal right."[73]

In this case, the Court finds that the Debtor did not engage in an ongoing scheme to deprive McKell of his money by misrepresenting the extent of equity in the Property. Indeed, the Debtor testified, and the Court finds, that at the time of the Loan, he fully intended to repay McKell through the ID Card Venture. Later, after the Loan came due, the Debtor testified that he worked to repay McKell from other investments. The Court accepts this testimony as evidence that the Debtor never intended to deprive McKell of amounts owing under the McKell Note. Further, the Debtor never infringed on McKell's right to record the Warranty Deed on the Property. Therefore, nothing in the record shows that the Debtor engaged in actual fraud to

---

[70] *Hatfield v. Thompson (In re Thompson)*, 555 B.R. 1, 10 (B.A.P. 10th Cir. 2016).

[71] *Husky Intern. Elec., Inc. v. Ritz*, 136 S. Ct. 1581, 1586 (2016).

[72] *In re Thompson*, 555 B.R. at 11 (citing *Ritz*, 136 S. Ct. at 1587).

[73] *Id.* at 11 (citing *In re Vickery*, 488 B.R. 680, 690 (B.A.P. 10th Cir. 2013) (quoting *Mellon Bank, N.A. v. Vitanovich (In re Vitanovich)*, 259 B.R. 873, 877 (B.A.P. 6th Cir. 2001))).

deprive McKell of his money. Therefore, McKell has not carried his burden to establish actual fraud in this case.

V.    CONCLUSION

The Court finds that the debt owing to McKell is not excepted from discharge under § 523(a)(2)(A) or (a)(2)(B).

_____oooOooo_____

## DESIGNATION OF PARTIES TO RECEIVE NOTICE

Service of the foregoing **FINDINGS OF FACT AND CONCLUSIONS OF LAW** shall be served to the parties and in the manner designated below.

**By Electronic Service:** I certify that the parties of record in this case as identified below, are registered CM/ECF users:

- Jared Inouye    jinouye@btjd.com, ebower@btjd.com;docketing@btjd.com;cmontoya@btjd.com
- Barry N. Johnson    bjohnson@btjd.com, rmccloud@btjd.com;docketing@btjd.com;rmerriman@btjd.com;bharman@btjd.com;kdunn@btjd.com;sharmon@btjd.com
- Joshua L. Lee    jlee@btjd.com, rmccloud@btjd.com;docketing@btjd.com;bboynton@btjd.com
- Steven M. Rogers    srogers@roruss.com, nrussell@roruss.com;rorusslaw@gmail.com;kacee@roruss.com

**By U.S. Mail:** In addition to the parties of record receiving notice through the CM/ECF system, the following parties should be served notice pursuant to Fed. R. Civ. P. 5(b).

**Kevin Robert Griffith**
3375 West 7800 South #715
West Jordan, UT 84088